UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: _____

To be supplied by Court

**JURY TRIAL DEMAND**



FILED BY _____ D.C.

DEC 0 1 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

BRUCE SIMMONS,

                Plaintiff,

v.

BROWARD COUNTY SHERIFF GREGORY TONY, BROWARD
COUNTY, FLORIDA, BROWARD COUNTY DEPUTY SHERIFF
TRAVIS COSGROVE, and DR. JAMES ROACH, CHIEF MEDICAL
DOCTOR for BROWARD COUNTY SHERIFF DEPARTMENT,
                Defendants.

_____/

**PLAINTIFF'S CIVIL RIGHTS COMPLAINT**
**42 U.S.C. SECTION 1983**

COMES NOW the Plaintiff, Bruce Simmons, who is proceeding in this cause

without the representation of counsel, in **pro se**, pursuant to 42 U.S.C. § 1983 of the

Civil Rights Act, and respectfully invokes the rule established in *Haines v. Kerner*,

404 U.S. 519 (1972) (holding *pro se* litigants to "less stringent standards than those

applied to attorneys"), and submit the following Memorandum of Law in Support of

this, his, Complaint for various violations of his Civil and Constitutional Rights at the hands of the Defendants, as set forth in more detail herein below.

## INTRODUCTION

1.      This is a civil rights action being filed under Section 1983 of the Civil Rights Act ("the Act"), alleging violations of Plaintiff's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

2.      On September 12, 2025, Plaintiff, Bruce Simmons, while visiting a Hospital for chest pains due to a chronic heart disease (congestive heart failure), was wrongfully detained, charged, and arrested by the Defendant, Broward County Deputy Sheriff Travis Cosgrove, and thereafter detained for approximately four (4) days *without bail*.

3.      On the same date, above, Defendant Cosgrove approached the Plaintiff, demanded Plaintiff's name, of which said Defendant had previously acquired from medical staff or others at the Hospital, and upon answering, *to a show of authority*, the Defendant ***immediately placed Plaintiff in handcuffs***, searched his pockets, retrieved Plaintiff's cell phone, currency, and other possessions, then read Plaintiff his Miranda Rights informing Plaintiff that he was being charged with domestic violence and battery. Those allegations are clearly ***FALSE AND NEVER HAPPENED***. In fact, Plaintiff was the VICTIM and tried to defend himself. Once Plaintiff informed the alleged victim that he, Plaintiff, was going to call the alleged

victim's Probation Officer to report the assault, the alleged victim *obviously caused injuries to herself or had another to inflict them upon her,* as we, alleged victim and I, had just watched on a television Movie a couple nights earlier.

4.      Thereafter, on 9/12/2025, Plaintiff was asked if he wished to speak to the Defendant, Deputy Cosgrove, waiving his right to silence, for which Plaintiff agreed. After informing Plaintiff of the allegations in the Criminal Complaint, Plaintiff informed said Defendant that ***the allegations were completely false***, and informed Defendant Cosgrove of his, Plaintiff's, account of the facts, in addition to ***showing*** Defendant Cosgrove ***fresh scars covering his body from being attacked by the alleged victim during an altercation days earlier***. Although Defendant Cosgrove verbally stated, "wow, both of you guys have injuries," it was later discovered that Defendant Cosgrove ***failed or refused to write down any of the statements Plaintiff provided to him in his defense of the charged allegations***. However, while Defendant Cosgrove failed or refused to take photographs of Plaintiff's injuries, as he did of the alleged victim, photographs of Plaintiff's injuries *were taken* by the Hospital officials, ***and by Plaintiff himself prior to visiting the Hospital***, and Defendant Cosgrove left out and refused to ***write down Plaintiff's account*** in order to falsely arrest and/or justify arresting the Plaintiff and making it appear that his, the Deputy's, written version of the Complaint was uncontested or reasonably probable.

5.      Due to Plaintiff's "*heart condition*," Plaintiff, despite having been arrested, was ***admitted into the hospital*** for his "***congestive heart failure***" and was ***not cleared for release until the third day*** of being arrested and held prisoner in a special detention room guarded 24 hours a day by Defendants, Broward Sheriff Department and Sheriff Gregory Tony's staff.

6.      Upon being cleared for release, by the Hospital's doctor(s), Plaintiff was provided a ***list of his heart and brain tumor medications***, along with a long list of ***other medically necessary medications*** designed to help keep Plaintiff alive and/or from suffering unnecessary and excruciating pains, the same of which had been prescribed by Medical Doctors ***recently and years and decades earlier*** as being "***medically necessary***" for the Plaintiff.

7.      On September 14, 2025, at approximately 3:30pm, upon being transferred from the Hospital to the Broward County Jail of the Defendant Sheriff Gregory Tony, Plaintiff was interviewed by medical personnel, determined ***necessary*** to be housed in the "*Infirmary*" section of the jail facility for closer medical observation; and, upon being further *interviewed* by a Doctor, Nurse(s) and/or Nurse Practitioner, and providing them with a copy of his Hospital Medical Record and medications, Plaintiff was placed into a jail cell.

8.      On September 14, 2025, Plaintiff, subsequently called out to employees of

Defendant Gregory Tony's, or to Defendant Dr. James Roach and/or his agents, requesting Plaintiff's *needed and medically prescribed* "*heart medications*, *high blood pressure medications*, *high cholesterol medication*, *prostate medications*, and his *brain mass/tumor pain medications*, *among others*," **to no avail**. In fact, Defendant Sheriff Tony's medical staff, Defendant Dr. James Roach, informed Plaintiff that "[they] ***did not have the heart medication on hand and it would not be available because they did not carry it in stock***." Said Defendant further advised Plaintiff that "[they] do *not provide the **type** of pain medications [Plaintiff was] prescribed* for [his] *brain mass/tumor* and that [Plaintiff] would have to settle for a "*Tylenol*" [non-effective] pain reliever.

9.      For that day, 9/14,2025 and the entire next day, Plaintiff was denied ***any necessary and needed medical care and treatment*** for conditions long ago declared *medically necessary*, as well as *medically necessary medicines* as he sat with *excruciating pains* attacking his body with *no relief available to him* as he sat in a jail cell with absolutely *no means of obtaining his freedom* so that he may enjoy life free of the *excruciating physical pain* that was physically assaulting and attacking his body.

10.     Plaintiff has a "***family history of congestive heart failure***" and has had more than one *heart attack* due to his heart condition. Plaintiff's heart was *malfunctioning*, not long ago, functioning at *only 27 percent (**ejection fractions**)*,

and Plaintiff is currently still not in the safe zone due to the seriousness of his *congestive heart failure* medical condition. Yet, the Defendants refused to either (1) *return Plaintiff to a Hospital* where he could receive proper and/or medical life-saving treatment, or (2) make available the *medically necessary medications* for not only Plaintiff's heart, but for the **brain mass/tumor pain** which could potentially cause Plaintiff to have, yet, another heart attack due to the excruciating pain from the "Brain Mass/Tumor" pressing against Plaintiff's brain which is "*inoperable*," along with pains associated with the two (2) *herniated disc in Plaintiff's back*, his hypertension, high blood pressure, including, but not limited to, Plaintiff's severe *arthritis* in both of his hips, hands, shoulders, and body, as Plaintiff was *placed on the floor* of the jail cell on a mat to sleep on.

11.     Plaintiff, experiencing *tremendous pain in his head and body*, worried and stressed whether he, like his *Sister Marilyn*, his *Father Jimmie Sr*., his *Grandfather John*, up to his *Great-Great-Great Grandfather Ned Simmons*, would succumb to death *from his heart condition* at the hands of the Defendants, who were *purposely and intentionally* depriving him of *medically necessary treatment* all in violation of the Eight Amendment to the United States Constitution's right to be free from cruel and unusual punishment and deliberate indifference to a serious medical need. Plaintiff was afraid that his heart, too, *would stop beating at any moment* due to the

***congestive heart failure*** that Plaintiff suffers from, and that has been the cause of his family's deaths throughout generations.

12.     On the night of September 15, 2025, at approximately 8:30pm, Plaintiff's family posted a $6,000.00 bail and Plaintiff was released and immediately was provided his medications *that his sister brought to him* upon being released on bail. It was, what felt like days, before Plaintiff's pain in and from his body appeared to resume its ordinary function from the use of his prescribed medications.

13.     Plaintiff, in the interim, was ordered by the Court not to return to his residence except with an Officer to obtain necessary clothing, medications, and other needed materials. In other words, Plaintiff was ordered *homeless* from his residence and not to communicate with the alleged victim-girlfriend.

14.     Plaintiff was advised, through a reliable source, that the alleged victim had notified the Office of the State Attorney, informing the State Attorney that she, the alleged victim, ***would not be pursuing any charges***, would not be leaving a forwarding address, would not have anything else to do with or say about the case or the matter, and would not even reside in the State of Florida until after the matter had been dismissed or dropped against the Plaintiff.

15.     On November 14, 2025, sixty-four (64) days after being arrested, with the

State of Florida having failed to file "formal charges" in the matter, Plaintiff filed a Pro se Motion to Dismiss the Information/Charges along with a Motion to Terminate Services of the Public Defender and for Self-Representation.

16.     On November 19, 2025, Plaintiff was notified that **all charges** against him had been dropped or dismissed, which was based on the State Attorney's Office having "**no witness**" and, in fact, **no proof that the allegations were ever true**, despite Plaintiff informing the Defendant Deputy Cosgrove that "the alleged victim, at the time of the events leading up to the arrest, had been *under the influence of alcoholic beverages, hallucinating, and made false allegations*."

17.     Plaintiff, because of the arrest and publicization of his photo and charges on the Broward County Jail website, among other things, has endured damages to his reputation, his character, his image in the community, and have loss respect from among the community, including, but not limited to, Plaintiff being *traumatized*, *victimized*, *defamed*, *slandered*, *and* *humiliated*, as a direct result of the false arrest/imprisonment and charges, which alleged that Plaintiff had "strangled" the alleged victim/woman which resulted into, also, future harm and damages to Plaintiff's *person and reputation*, as well as to that of his family's image in the community.

18.     Because Defendant Cosgrove **concealed evidence**, Plaintiff's statements

after waiving his Miranda Rights, and said Defendant also refused to take any photographs of Plaintiff's *injuries*, clearly there was "no probable cause" nor was there any "arguable probable cause" to arrest Plaintiff ***on the false charges alleged in the arrest affidavit*** where, *among other things*, Plaintiff informed Defendant Deputy Cosgrove that "he, Plaintiff, *was the victim and had a right to Stand his Ground, and [that he] defended himself against being attacked by the intoxicated alleged victim*." In fact, ***the allegations in the Police Report or Arrest Affidavit are one hundred percent (100%) false***.

19.    Plaintiff was under supervision *subject to reincarceration* should he fail to comply with stipulations made by the Court. Plaintiff was emotionally and psychologically stressed from fear of being rearrested and the possibility of being convicted for crimes he did not commit.

20.    On November 19, 2025 after his arrest, imprisonment, and release upon supervision, and after Plaintiff filing his *Pro se* Motion to Dismiss Charges, the State of Florida "Declined [the] Case," or rather, the State of Florida filed a Notice to the Court that the State [had no evidence to try the Plaintiff on in a criminal trial]. As such, an "Order Terminating Pretrial Release Conditions and Dismissing the Charges were entered, thus, exonerating Plaintiff of the false accusations or charges." (See Exhibits A & B, respectively)

21.    This is an action for monetary damages brought pursuant to 42 U.S.C. of

Sections 1983 of the Civil Rights Act, and the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

## JURISDICTION

22.   This action arises under federal law, Fourth, Fifth, Eighth, and the Fourteenth Amendments to the United States Constitution; and § 13, Art. X, of Florida Constitution.

23.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331 (federal question) and section 1343(a)(3) (civil rights) and on the Supplemental Jurisdiction of this Court to entertain claims under state law pursuant to 28 U.S.C. Section 1367(a). Venue is proper in this district under 28 U.S.C. § 1391(b) because this is where the events complained of occurred.

24.  All conditions precedent to the maintenance of this action have been performed or have occurred prior to its institution, including those set forth in Florida Statute Chapter 768.

## PARTIES INVOLVED

25.  The Defendant, Broward County, is a municipal entity organized under the laws of the State of Florida, and Defendant Gregory Tony is the Broward County Sheriff who operates as the Sheriff of Broward County, Florida, being delegated with, and/or in charge of protecting the constitutional and civil rights, including the medical care, of all persons criminally charged and placed in and under

the care, custody, and control of all Broward County Detention Facilities, as well as charged with *properly training his staff including on what constitutes probable cause and taking of statements from witnesses*. Defendants caused and/or participated in causing the constitutional violations alleged herein. These Defendants are being sued in his/their ***Official*** capacities, and is/are otherwise *sui juris*. The mailing address is Broward County Courthouse, 201 S.E. 6th Street, Fort Lauderdale, Florida, 33311.

26.   The Defendant, Broward County Deputy Sheriff Travis Cosgrove, was at all times relevant to this cause a duly appointed Deputy Sheriff Officer acting under color of law, <u>*within the course and scope of employment*</u> with the Broward County Sheriff Department, and caused or participated in causing the constitutional violations alleged herein, and is otherwise *sui juris*. His mailing address is Broward County Courthouse, 201 S.E. 6th Street, Fort Lauderdale, Florida, 33311. He is being sued in his ***Individual*** and/or ***Official*** capacity(ies).

27.   The Defendant, Dr. James Roach, is the Chief Medical Director for the Broward County Sheriff's Department, charged with providing medical care and treatment to all persons charged and detained by Defendant Sheriff Gregory Tony, and is otherwise *sui juris*. His mailing address is Broward County Courthouse, 201 S.E. 6th Street, Fort Lauderdale, Florida, 33311. He is being sued in his ***Official*** capacity.

28.    The Plaintiff, Bruce Simmons, at the time of the events leading to this action, was/is a resident of Broward County, Florida, currently residing in Broward County, Florida, at 283 S.W. 8th Street, Dania Beach, Florida, 33004. At the time of the incident, that gave rise to this Complaint, Plaintiff was a 69-year-old male with *multiple serious medical issues and is disabled*.

29.    Defendant Broward County, itself, [Sheriff Department] is governed by a Board of Commissioners or Directors, and was at all times ***acting under color of law and within the scope of their employment***, to wit: under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Florida, and/or of Broward County, Florida.

30.    Defendant, Broward County Sheriff Gregory Tony was at all times relevant to this matter the Sheriff of Broward County, Florida, ***acting under color of law and within the scope of his employment***, to wit: under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Florida, and/or of Broward County, Florida.

31.    Defendant, Travis Cosgrove, is a Broward County Sheriff Deputy and the arresting officer who was ***acting under color of law and within the scope of his employment***, to wit: under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Florida, and/or of Broward County, Florida.

32.     Defendant, Dr. James Roach, is the Chief Medical Director of and/or for the Broward County Sheriff's Department, ***acting under color of law and within the scope of his employment***, to wit: under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Florida, and/or of Broward County, Florida.

33.     All Defendants acted under the "***color of state law and within the scope of their employment***" during all times relevant to this matter.

34.     Defendants' conduct, at all times relevant to this matter, deprived Plaintiff of basic, fundamental, civil, and constitutional rights, privileges, and/or immunities secured by both the Florida and United States Constitutions.

35.     Plaintiff, at all times relevant to this matter, was unlawfully placed in the custody, control, and care of the Defendant, Sheriff Gregory Tony, and was denied ***medically necessary care and treatment*** while in said custody of the Defendants.

36.     At all material times, the Defendants were engaged in conduct that was the proximate cause of the violations of Plaintiff's state and federally protected rights and the damages suffered therefrom.

## STATEMENT OF THE FACTS

37.     On September 12, 2025, Plaintiff was informed, via telephone, by his girlfriend, the alleged victim, that she had gone to the local Hospital for a checkup

to determine the cause of her soreness after Plaintiff and alleged victim, 2-3 nights earlier, had an altercation.

38.   Plaintiff, who suffers from ***congested heart failure and an inoperable brain mass/tumor***, among a multitude of other medical conditions, went to said Hospital where his girlfriend, alleged victim, was located, and upon entry, suffered chest pains that resulted into Plaintiff being hospitalized.

39.   While being examined by medical personnel, Defendant, Deputy Travis Cosgrove, approached Plaintiff, who was lying in a hospital bed, and requested whether Plaintiff's name was Bruce Simmons. Answering in the affirmative, Defendant Cosgrove immediately placed Plaintiff in handcuffs without asking any questions and stated "***you are under arrest***," and read Plaintiff his Miranda Rights.

40.   Plaintiff then inquired of the reason(s) for his being arrested, and the Defendant informed Plaintiff of the allegations in the arrest affidavit, of which Plaintiff informed the Defendant that ***the allegations were false***, and that he, Plaintiff, had every right to defend himself against being attacked, at which time Plaintiff *showed Defendant Cosgrove* a multitude of fresh scars, deep scratches and wounds to Plaintiff's neck, arms, hands, chest, and back of head/neck area, including marks to Plaintiff's face where he had been ***punched multiple times*** by the alleged victim.

41.   Plaintiff was asked if he had wished to waive his Miranda Rights, of which Plaintiff did waive and then provided Defendant Cosgrove with a full account of the encounter between he and the alleged victim. Defendant Cosgrove, upon observing the multiple injuries to Plaintiff, stated that "both of you guys are injured," yet the Defendant, Deputy Cosgrove, failed or refused to take any photographs of Plaintiffs injuries, and it was later discovered that Defendant Cosgrove *__failed or refused to document any of the statements, in his Arrest Affidavit or Report__*, provided by Plaintiff, and *never mentioned* that Plaintiff gave a post-arrest statement.

42.   Plaintiff, although being arrested, *was ordered to remain hospitalized*, by the medical doctor, due to complications of Plaintiff's test results and congestive heart failure, among other things, observed by the medical doctors.

43.   On September 14, 2025, after almost three (3) days in the hospital under 24 hours guard by Broward Sheriff Deputies, due to having been arrested at the Hospital, Plaintiff *was cleared* by the medical doctor(s) to be released from the Hospital, at which time Plaintiff was provided a list of his *medically necessary medications*, and presumably Broward Sheriff Department was, likewise, provided a copy of Plaintiff's medications list, including the "heart medications," medications for Plaintiff's "inoperable brain mass/tumor, hypertension, high cholesterol, prostate medications, *among many others*."

44.   Upon arrival at Broward County Main Detention Facility, Plaintiff was interviewed by medical staff, and a copy of Plaintiff's list of medications was copied and presumably placed in Plaintiff's medical file. It was determined that Plaintiff's medical condition required him to be assigned to the "Medical Infirmary" for observation and medical treatment rather than to be assigned to the open inmate population, or regular jail cells.

45.   Despite having two (2) *herniated discs* in his back, Plaintiff was forced to sleep on a floor rack, a plastic rack only inches from the floor; and more importantly, Plaintiff was DENIED medically necessary *treatment and medications* of which Plaintiff had been prescribed for his "congestive heart failure" and was denied proper medical treatment for his "brain mass/tumor" all of which Defendant knew were medically prescribed.

46.   Defendants, Dr. James Roach, the Chief Medical Director, and/or his Agents, along with Defendant Sheriff Gregory Tony and/or his Agents, deprived Plaintiff of his Eight Amendment rights against cruel and unusual punishment and deliberate indifference to serious medical needs by denying Plaintiff any proper and necessary "pain medications" as prescribed by a physician and offered Plaintiff a non-productive regular Tylenol non-prescription medication knowing the same was inadequate, and further informed Plaintiff that they "do not carry either the needed heart medication nor the prescription pain medications." Defendants informed

Plaintiff that he "<u>will have to do without the meds unless and until [he] can post bail to be released</u>."

47.   For September 14 & 15, 2025, Plaintiff was deprived of "*pain medications*" despite his "*crying out in pain*," and was denied his "*heart medications*" despite his heart problems and reasonable possibility or probability of death, especially given that Plaintiff has a "***family history of deaths from congestive heart failure***" stemming decades earlier from his Great-Great-Great Grandfather, his Grandfather, his Father, and his Sister.

48.   Plaintiff, afraid of being placed in what appeared to be a "straight-jacket," and referred to as a form of punishment or disciplinary action for repeatedly demanding medical treatment, laid on the floor cart curled up in a knot, suffering each physically, emotionally, and psychologically, from each of the pains in his head and back, as well as suffering from what appeared to be the lack of blood flow from his heart failure (wherewith Plaintiff's "Ejection Fractions was only 27% in recent times, meaning the heart was pumping ***only 27% of its blood to the body***)

49.   On September 15, 2025 Plaintiff was taken, *for the first time*, before a Magistrate Judge/Court in which said judge determined, based upon the arrest affidavit or complaint, that *probable cause existed* that Plaintiff committed the charged offenses of <u>domestic violence by strangulation and battery</u>. Bail was set at a total of $6,000.00, and at approximately 8:30pm, Plaintiff's family posted bail.

50.     Plaintiff was subsequently released with *specific conditions* that included Plaintiff not returning to his residence and having to find a temporary residence to live.

51.     Plaintiff, having no place to reside, **_slept in his vehicle and lived a homeless man's life_** out of fear of being arrested if he entered his home where he had resided for almost ten (10) years.

52.     Plaintiff was subsequently informed that the alleged victim had relocated, allowing him to return to his residence after being assured that the alleged victim had vacated the premises.

53.     On November 19, 2025, after the State of Florida *declined* to file formal charges, or to pursue any charges against Plaintiff, related to the allegations stated in the arrest affidavit or complaint, the Court *dismissed/dropped* each of the [false] charges [*with prejudice*] that had been lodged against Plaintiff.

54.     This Civil Rights Complaint follows.

## **COUNT ONE**
## **FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983: Fourth Amendment –Unlawful
Seizure/False Arrest and Malicious Prosecution
Against Deputy Travis Cosgrove**
.

55.     Plaintiff Simmons realleges paragraphs one through fifty-four (1-54) and incorporates them herein, by reference, as though alleged in its entirety, hereat.

56.     Defendant, Deputy Travis Cosgrove, acting under the color of law and within the scope of his employment, arrested Plaintiff *without probable cause*, and in doing so, ***willfully and maliciously omitted exculpatory evidence***, Plaintiff's statements, taken after Plaintiff waived his Miranda Rights, of the facts leading to the charges against Plaintiff as well as refusing to take photographs of Plaintiff's injuries which would have supported Plaintiff's account of the facts and called into questions the allegations, or so-called probable cause to arrest Plaintiff, asserted in the arrest affidavit. Thereby, Defendant Cosgrove arrested Plaintiff without probable cause or arguable probable cause ***based on a false arrest affidavit***.

57.     Defendant Cosgrove's conduct deprived Plaintiff of rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments.

58.     As a direct and proximate result, such actions deprived Plaintiff of his *freedom and liberty*, caused *emotional distress*, *humiliation* and *physical harm* and Plaintiff suffered other damages as described above and herein including *cruel and unusual punishment and deliberate indifference to serious medical needs*.

## <u>COUNT TWO</u>
## <u>SECOND CAUSE OF ACTION</u>

### 42 U.S.C. § 1983: Monell Liability Against
### Broward County [Sheriff Department]

59.     Plaintiff Simmons realleges paragraphs one through fifty-eight (1-58) and incorporates them herein, by reference, as though alleged in its entirety, hereat.

60.     Defendant Broward County Sheriff Department maintained policies, customs, or practices exhibiting deliberate indifference to the constitutional rights of persons, including but not limited to:

(a) Failure to properly train and supervise officers regarding probable cause and lawful arrest standards;

(b) Ratification of unconstitutional arrests;

(c) Failure to maintain necessary medical treatment, medications for serious medical needs, and medical care, or solutions in the absence of necessary care not available at the facility;

(d) A custom of tolerating or ignoring false arrest by officers and failure to maintain or provide medically necessary treatment and/or medications.

(e) These policies, practices, or customs *were the moving force* behind Plaintiff's unlawful arrest and resulting injuries. As a direct and proximate result, such deprived Plaintiff of his freedom and liberty, caused emotional distress, humiliation, deprivation of proper and medically necessary treatment, physical harm, and Plaintiff suffered other damages as described above.

## COUNT THREE
## THIRD CAUSE OF ACTION

## 42 U.S.C. § 1983: Monell Liability Against
## Broward County Sheriff Gregory Tony

61.     Plaintiff Simmons realleges paragraphs one through sixty (1-60) and incorporates them herein, by reference, as though alleged in its entirety, hereat.

62.     Plaintiff specifically states that:  Defendant Broward County Sheriff Gregory Tony maintained policies, customs, or practices exhibiting deliberate indifference to the constitutional rights of persons, including but not limited to:

(a) Failure to properly train and supervise officers regarding probable cause and lawful arrest standards;

(b) Ratification of unconstitutional arrests;

(c) Failure to maintain necessary medical treatment, medications for serious medical needs, and medical care, or solutions in the absence of necessary care not available at the facility;

(d) A custom of tolerating or ignoring false arrest by officers.

(e) These policies, practices, or customs were the moving force behind Plaintiff's unlawful arrest and resulting injuries. As a direct and proximate result, such deprived Plaintiff of his freedom and liberty, caused emotional distress, humiliation and physical harm and Plaintiff suffered other damages as described above.

## **COUNT FOUR**
## **FOURTH CAUSE OF ACTION**

**FALSE ARREST / FALSE IMPRISONMENT, AND
MALICIOUS PROSECUTION (STATE LAW)
AGAINST DEFENDANTS DEPUTY COSGROVE
AND BROWARD SHERIFF GREGORY TONY**

63.     Plaintiff Simmons realleges paragraphs one through sixty-two (1-62) and incorporates them herein, by reference, as though alleged in its entirety, hereat.

64.     Defendants intentionally confined Plaintiff without *any investigation into the truthfulness of the allegations*, without lawful justification, and did so with malice *while concealing exculpatory evidence* and neglecting his/their duties and responsibilities, all willfully, intentionally, and with extreme malice.

65.     The confinement was against Plaintiff's will and without consent.

66.     As a direct and proximate result, Plaintiff suffered physical, emotional, and economic harm, deprived Plaintiff of his freedom and liberty, caused emotional distress, humiliation, and physical harm due to deprivation of medically necessary treatment. Plaintiff suffered other damages as described above.

67.     Pursuant to § 768.28, Florida Statutes, Plaintiff notified Defendants, prior to filing, through its attorney of this action, and said claim was not resolved.

**COUNT FIVE**

**FIFTH CAUSE OF ACTION**

**DELIBERATE INDIFFERENCE TO SERIOUS
MEDICAL NEEDS AGAINST DEFENDANTS
DR. JAMES ROACH, GREGORY TONY, AND
BROWARD COUNTY FLORIDA [SHERIFF
DEPARTMENT] AND DEPUTY COSGROVE**

22

68.     Plaintiff Simmons realleges paragraphs one through sixty-seven (1-67) and incorporates them herein, by reference, as though alleged in its entirety, hereat.

69.     Plaintiff, while imprisoned by the Defendants, was denied his Eighth Amendment right to be free from _cruel and unusual punishment and from deliberate_ _indifference to a serious medical need_ when the Defendants, including, but not limited to, Defendant Dr. James Roach, the Chief Medical Director, deprived Plaintiff of life-saving medications, for his **_congestive heart failure_**, as well as refusing and denying Plaintiff of medically necessary "pain medications" for Plaintiff's diagnosed "**_Inoperable Brain Mass/Tumor_**," which could also have resulted into Plaintiff potentially going into "cardiac arrest" from the sudden discontinuance of Plaintiff's _medically necessary and prescribed_ pain medications (Oxycodone and OxyContin) of which Plaintiff has been lawfully consuming _every_ _day numerous times a day (4-6) for decades_, the same of which could have resulted into death and did cause Plaintiff to suffer, as well as other serious medical conditions.

70.     Defendants, Dr. Roach and Sheriff Gregory Tony, via his/their agents, stated that the Broward County Sheriff's Medical Department did "_not have the type_ _of heart medication Plaintiff was prescribed and would not have said medication_ _most likely before Plaintiff would be released on bail_." These Defendants also stated that the Broward County Sheriff's Medical Department did "_not have any [narcotic_

*type] pain medication" for Plaintiff's [inoperable brain mass/tumor]* and stated that Plaintiff could *accept regular over-the-counter Tylenol pain reliever medication for his pain*.

71.     Defendants, Sheriff Gregory Tony, the Broward County Sheriff Department, and Dr. James Roach, ***knowingly maintained an inadequate medical facility***, and upon discovering that the Medical Department did not have in its inventory the ***medically necessary treatments*** for Plaintiff, Defendants ***should have returned Plaintiff to the, or a, Hospital, or other facility*** where such medically necessary treatment was, in fact, available for the Plaintiff, especially when Plaintiff was arrested, by Defendant Cosgrove and Gregory Tony, ***at and from a Hospital for his heart condition***. Failing or refusing to ***return*** Plaintiff to a proper medical facility or hospital was ***deliberate indifference to a serious medical need*** in violation of the Eighth Amendment.

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF CIVL RIGHTS COMPLAINT
## 42 U.S.C. SECTION 1983

Plaintiff, Bruce Simmons files this, his, Memorandum of Law in Support of Civil Rights Complaint for various violations of his Civil and Constitutional Rights as follows. Plaintiff will provide the applicable laws in support of his claims with respect to the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, among other things.

1.          **FOURTH AMENDMENT VIOLATION**

**NO PROBABLE CAUSE EXISTED TO ARREST PLAINTIFF
AND THE STATE ATTORNEY REFUSED OR DECLINED TO
PROSECUTE/FILE FORMAL CHARGES AGAINST PLAINTIFF**

The Magistrate Judge concluded that the officer did have "probable cause" to arrest Plaintiff, although the Court was *unaware that the Defendant Officer **failed or refused to include in his Police Report or Arrest Affidavit Plaintiff's statements** in defense of the allegations/charges which was acquired during the investigation*. This conclusion appears to be based on what a "reasonable officer may or could have believed."

Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause. The Supreme Court has, thus, concluded that "the preference for warrants is most appropriately effectuated by according "great deference" to a Magistrate's determination." *Spinelli v. United States*, 393 U.S 410, 419, 89 S. Ct. 584, 590 (1969). ***Deference to the Magistrate, however, is not boundless***. It is clear, first, that the deference accorded to a Magistrate's finding of probable cause *does not preclude inquiry into the knowing or reckless falsity of the affidavit* on which the determination was based. *Franks v. Delaware*, 438 U.S. 154, 198 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

Second, the courts must also insist that the Magistrate purport to "perform his 'neutral and detached' function ***and not serve merely as a rubber stamp for the***

*police.*" *Aguilar v. Texas*, 378 U.S 108, 111, 84 S. Ct. 1509, 1512, 12 L. Ed. 2d 723 (1964). See *Illinois v. Gates*, 462 U.S 213, 239 (1983). A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-327 (1979). Indeed, "it would be an unthinkable imposition upon [the Magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberate or reckless false statement, were to stand beyond impeachment." *Franks*, 438 U.S. at 165, 98 S.Ct. at 2681.

Reviewing courts should not defer to a warrant based on an affidavit that does not "provide the Magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. at 239, 103 S.Ct. at 2332.Sufficient information should be presented to the Magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. Id. See *Aguilar v. Texas*, 378 U.S 108, 114-15, 84 S. Ct. at 1513-14; *Giordenello v. United States*, 357 U.S. 480 (1958); and *Nathanson v. United States*, 290 U.S. 41 (1933).

In this case, the Magistrate was not privy to all the facts based on the Officer's failure to include in the arrest affidavit exculpatory evidence (Plaintiff's post-arrest

statements regarding self-defense and being the actual victim). That is, the arrest affidavit was, among other things, false; and the arresting Officer acknowledged, during the investigation, and in Plaintiff's presence, that Plaintiff bore signs of having been assaulted based on open clear wounds covering Plaintiff's body.

Yet, the Officer refused, maliciously, to include his observations and Plaintiff's post-arrest statements in his report, which could or would have diminished the probability of any criminal conduct from Plaintiff and shown a right to "stand my ground" as a matter of law. Good faith, on behalf of the arresting officers is not enough, to protect an officer from liability. As the Court stated, "*if subjective good faith alone were the test, the protections of the Fourth amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police*." *Beck v. Ohio*, 379 U.S. 89, 97,85 S.Ct. 223, 228, 13 L. Ed. 2d 142 (1964); *Henry v. United States*, 361 U.S. 98, 102, 80 S. Ct. 168, 171, 4 L. Ed. 2d 134 (1959).

Consequently, the United States Supreme Court has held that "*a detention, even if there appeared to be probable cause* **at the start of the process**, *was grounds for a Fourth Amendment claim* **when probable cause was later 'not' found to exist**." Therefore, Mr. Simmons' detention and arrest for the *alleged* violations was**,** in fact**,** a violation of his Fourth Amendment rights against false arrest and detention. The Court has held that "an individual's claim that challenges

pretrial detention falls within the scope of the Fourth amendment regardless of whether legal process has begun [because] [e]ven where legal process has begun, the prosecution itself may be unsupported by probable cause, which gives rise to a Fourth amendment claim. The High Court has stated that:

> "The Fourth Amendment prohibits government officials from detaining a person absent probable cause. ***And where legal process has gone forward, <u>but has done nothing to satisfy the probable-cause requirement</u>, it cannot extinguish a detainee's Fourth Amendment claim***."

See *Manuel v. City of Joliet, Illinois*, 580 U.S. ____ (2017). Explaining, the Court went on to state:

> "That was the case here: Because the judge's determination of probable cause was based solely on ***fabricated evidence***, it ***<u>did not expunge</u> Manuel's Fourth Amendment claim when he sought relief <u>not merely for his arrest</u>, but also for his pretrial detention***."

(<u>Id.</u>).   In the instant case, unlike *Manuel*, *supra*, Mr. Simmons' judge, ***per*** the Prosecuting Attorney or the State of Florida, ***<u>dismissed/dropped</u>***, or "***<u>No Info[rmation]</u>***" the charges ***without*** Plaintiff ever having to defend against the false charges in a court of law. Therefore, the police officers' determination of "probable cause" to detain and/or arrest Mr. Simmons, based on either his assumed "probable cause" or assumed "*arguable* probable cause" does not and cannot "extinguish Plaintiff's Fourth Amendment claim" where, as here, the arrest on the determination

of alleged "probable cause" ***failed to exist*** by way of the Prosecuting Attorney "declining to prosecute the charges" and the court/judge dismissing the charges.

Based on these authorities, ***and the facts of this case***, it is irrelevant whether the officers ***believed*** they/he had "*arguable*" probable cause or not, the fact that "*probable cause **failed to exist***" in the eyes of the State Attorney is what establishes the Fourth Amendment claim. As the Court stated in <u>*Manuel*</u>:

> "That the pretrial restraints … arose pursuant to a ***legal process <u>made no difference</u>***, given that they were allegedly ***<u>unsupported by probable cause</u>***."

Because Mr. Simmons was arrested on what the officers *believed* was probable cause, such does not negate the law, <u>*Manuel*</u>, which is that, *in the end* "**<u>no probable cause was found</u>**" to justify Mr. Simmons' arrest; and that failure ***does not extinguish the Fourth Amendment right*** to be free from *unreasonable* restraints on freedoms and the illegal search and seizure of the Plaintiff, Mr. Simmons.

The High Court, on Remand, directed the lower Court to look to the "common law of torts" for guidance. The same applies, equally, to Mr. Simmons' case, and this Court should, as did the Supreme Court, find that Mr. Simmons' Fourth Amendment rights were violated because, *assuming, arguendo*, there may have *appeared* to be probable cause or ***despite the legal process***, <u>*at the end of the day*</u>, "***<u>no probable cause was found to exist</u>***," and the Fourth Amendment claim is proper. In this case, both a false arrest/detention and malicious prosecution occurred.

Malicious prosecution claims require, *inter alia*, termination of the charges, while a Fourth Amendment violation occurs regardless of whether charges are eventually dismissed or not. *Manuel*, supra. The based on these Defendants caused the proximate injury to Plaintiff based on all the above facts as well as those below.

2.          **EIGHTH AMENDMENT VIOLATIONS**

**DEFENDANTS ARE LIABLE FOR THE DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEEDS AS IT RELATES TO DENYING THE PLAINTIFF MEDICALLY NECESSARY AND LIFE PRESERVING MEDICATION AMONG OTHER MEDICATION THAT WERE DEEMED MEDICALLY NECESSARY**

Plaintiff was arrested, albeit unlawfully, at a hospital where he had been treated and admitted as a direct result of his congestive heart failure per medical professionals' decision. While at the hospital, and having been admitted, Plaintiff was arrested, by Defendants Deputy Cosgrove and Sheriff Gregory Tony, as he sat on a hospital bed. After several days, of being handcuffed and shackled to a bed, and with so much anxiety and stress until Plaintiff was unable to use the restroom for four (4) days, Plaintiff was subsequently, after three days, cleared for release by medical professionals and was, thereafter, transported to the Broward County Jail Facility where, for the next nearly two (2) days, Plaintiff was **denied** any form of medications for his "*congestive heart failure*" and his "*inoperable brain mass/tumor*" of which Plaintiff was under doctor's care and ***prescribed medications***

that were/are deemed ***medically necessary*** for (1) the preservation of Plaintiff's life, due to ***congestive heart failure***, (2) the prevention of excruciating head pain, due to an ***inoperable brain tumor***, (3) ***a significantly enlarged prostate***, causing Plaintiff the inability to urinate, and deprivation of meds prevented Plaintiff, during incarceration, from urinating and/or caused extremely painful attempts to urinate, and (4) ***numerous other medications***, approximately 5-7 that were not made available despite Defendants having knowledge of the same.

In fact, Defendants, including Dr. James Roach, Chief Medical Physician for Broward County Sheriff Department and Defendant Sheriff Gregory Tony, knew that they did not provide certain types of medications in their arsenal of medications, such as prescription pain medications as well as medications for congestive heart failure, Entresto, or Tamsulosin for the prostate, and yet these Defendants refused or failed to make preparations for proper medical care of criminal defendants who might need said medications to save their lives from death. Otherwise, these Defendants refused to arrange for criminal defendants, such as the Plaintiff, to be returned to a hospital to receive life-saving medications or to provide other means to accommodate the medically necessary treatment for those under their custody and control. This action constitutes deliberate indifference to a serious medical need and cruel and unusual punishment in violation of the Eighth Amendment of the United

States Constitution, and a violation of Due Process and Equal Protections of Law under the Fourteenth Amendment.

## EIGHTH AMENDMENT VIOLATION:

The Eighth Amendment prohibits any punishment which violates civilized standards of decency or "involve[s] the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); see also, *Campbell v. Sikes*, 169 F. 3d 1353, 1363 (11th Cir. 1999). An Eighth Amendment claim contains both an objective and subjective component. *Taylor v. Adams*, 221 F. 3d 1254, 1257 (11th Cir. 2000); *Adams v. Poag*, 61 F. 3d 1537, 1543 (11th Cir. 1995). First, a plaintiff must set forth evidence of an objectively serious medical need. *Taylor*, 221 F. 3d at 1258; Adams, 61 F. 3d at 1543. Second, a plaintiff must prove that the prison official acted with an attitude of "deliberate indifference" to that serious medical need. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *McElligott v. Foley*, 182 F. 3d 1248, 1254 (11th Cir. 1999); and *Campbell v. Sikes*, 169 F. 3d at 1363.

The objective component requires the plaintiff to demonstrate that he has been subjected to specific deprivations that are so serious that they deny him "the minimum civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); see also, *Hudson v. McMillian*, 501 U.S. 1, 8-9 (1992). A serious medical need is one that has been diagnosed by a physician as mandating treatment

or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F. 3d 1176, 1187 (11th Cir. 1994). The subjective component requires the plaintiff to demonstrate that the prison officials acted wantonly, with deliberate indifference to the plaintiff's serious needs. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991). Deliberate indifference is the reckless disregard of a substantial risk of serious harm; mere negligence will not suffice. Id., at 835-36.

"An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe County*, 116 F. 3d 1419, 1425 (11th Cir. 1997). Alternatively, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours." *McElligott v. Foley*, 182 F. 3d at 1255.

In this case, Plaintiff was hospitalized, from whence, thereafter, he was transported, after being cleared by physicians, to the Broward County Jail Facility with a copy of his hospital release documents containing his list of medically necessary prescription medications that the Plaintiff had been consuming, some of which, for decades. Specifically, Plaintiff was diagnosed with congestive heart failure, having previously endured heart attacks, and was medically required to consume a special medication for various conditions.

For example, Plaintiff was diagnosed with severe heart disease, and directed to take **(1)** <u>Entresto</u> 24-26 MG Tab 2X Daily for congestive heart failure, along with **(2)** <u>Carvedilol</u> 6.25 MG Tab, another heart and blood pressure medication; **(3)** <u>Oxycontin</u> 10 MG Tab; and **(4)** <u>Oxycodone – Acetaminophen</u> 10-325 (<u>3X and 6X Daily, respectively</u>) for brain tumor pain management; **(5)** <u>Finasteride</u> 5 MG Tab and **(6)** <u>Tamsulosin</u> 0.4 MG Cap (1X Daily each) for Enlarged Prostate Gland; **(7)** <u>Furosemide</u> 20 MG Tab (for swelling due to heart failure) to reduce water retention and help kidney function; **(8)** <u>Simvastatin</u> 10 MG Tab 1X Daily (for High Cholesterol and triglyceride levels in blood to reduce further risk of my heart disease and heart attacks); **(9)** <u>Pantoprazole</u> DR 40 MG Tab 1X Daily (for my Gastroesophageal Reflux Disease); **(10)** <u>Gabapentin</u> 600 MG Tab 3X Daily (for nerve pain to my inoperable brain tumor and prevent seizures); **(11)** <u>Methocarbamol</u> 500 MG Tab 2X Daily (for muscle spasm and the two (2) herniate disc in my back; among others, including Patches, of which Plaintiff will cease to mention, but can, upon request submit other medications prescribed.

To satisfy both the objective and subjective components of an Eighth Amendment violation, Plaintiff will submit documents of diagnoses for his inoperable brain mass/tumor, herniated disc, congestive heart failure and more. Here, the following will be listed as follows: (1) heart disease (<u>Exhibit C</u>) (documents from various physicians); (2) Inoperable Brain Mass/Tumor (<u>Exhibit D</u>)

(documents from various physicians showing diagnoses); and (3) Diagnosis of Brian Mass/Tumor (<u>Exhibit E</u>) (asserting that "there is no indication for any surgical intervention [with] this gentleman [the Plaintiff and] no other treatment ... there is nothing [doctors] can offer [Plaintiff] from a neurological standpoint").

Because the Defendants knew of the above medications needed by Plaintiff, knew of Plaintiff's heart condition, being Defendants sat for three (3) days in the hospital room guarding Plaintiff, awaiting clearance for the heart condition, so as to transport Plaintiff to be booked in the Broward County Jail on the charges associated with this claim, but Defendants refused or failed to provide any medical treatment, medically necessary for Plaintiff's proper care, despite the meds being for a serious medical and life-saving need (***congestive heart failure***), even by way of Plaintiff providing a copy of the same to them, from the Hospital, while in police custody, the same constitutes a violation of the Eighth Amendment.

Defendant, Dr. Roach, failed to provide the ***heart medication or any proper pain medications for Plaintiff's brain tumor***, among others, and Defendant Gregory Tony knew, or should have known, that apparently for years his facility lacked proper medical supplies or medications, and such constitutes a deliberate indifference to a serious medical need. In fact, Defendants knew that they did not provide proper care for those placed in their custody and control because Defendants informed Plaintiff, upon Plaintiff's request for his required medications, including

the heart medications, that they "*did not carry the type of heart medications Plaintiff needed, and that [they] would not have any forthcoming*, and did not provide any form of prescription opioids to prisoners. "

Defendants, Dr. Roach and Sheriff Gregory Tony, should have returned the Plaintiff to a hospital, or other facility, where proper medical treatment was available. Plaintiff suffered, *physically*, emotionally, and psychologically, for not being provided the heart meds, and the pain medications which are *habit-forming*, of which Plaintiff has been consuming every day for more than thirty (30) consecutive years and, then/now having a *dependence* upon the medications for more than one reason. By failing to provide Plaintiff with an equivalent prescription medication, Defendants caused Plaintiff to *shake* and *shiver*, *hurt*, *cry*, with *excruciating pains*, **for days**, with no assistance and constant refusal to treat Plaintiff, subjecting him to *unbearable* pains.

Any physician, or person with reasonable common sense, **would know** that a person **cannot** abruptly, after 30 years on a controlled substance narcotic, be discontinued a prescription narcotic, such as oxycontin and oxycodone, without subjecting the person to a **life-threatening** situation, including **heart attacks**, **seizures**, **strokes**, or **even death**, as a direct result of discontinuing the medication. Moreover, Defendants were also aware that failure to provide Plaintiff with the heart medications could potentially result into the death of Plaintiff. Plaintiff also cannot

urinate *without the assistance of his prostate medications*, and suffered from the retention of urine for days, potentially destroying his kidneys.

Yet, Defendants **turned a blind eye** as Plaintiff sat on a thin mat, on the floor of the jail, suffering, shivering, crying, and wishing for sleep and not to awake, for the pain was so severe. All this while Defendants, and their agents, walked by rendering no aid or assistance, except to state that "*you should be released on bail soon*." Plaintiff had a constitutional right not to be treated in such a manner, and Defendants are liable for their actions. Plaintiff has satisfied the elements for stating a claim upon which relief may be granted, and this Court should enter judgment in favor of the Plaintiff and against the Defendants.

WHEREFORE, Plaintiff respectfully requests this Court to award reasonable and appropriate Compensatory and Punitive Damages as stated below.

Respectfully submitted,

*Bruce Simmons*

Bruce Simmons--Pro se

## DAMAGES

Plaintiff seeks compensatory, punitive, and nominal damages from each of the Defendants as follows.

**COMPENSATORY DAMAGES** (Eighth Amendment violation) in the amount not less than $25,000,000.00 from each Defendant, *or* an amount to be determined at trial.

**COMPENSATORY DAMAGES** (Fourth Amendment violation) in the amount not less than $25,000,000.00 from each Defendant, *or* an amount to be determined at trial.

**PUNITIVE DAMAGES** (as a message to prevent other and further reoccurrences) in the amount of $50,000,000.00 *or* an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(A)     Enter judgment in favor of Plaintiff and against Defendants;

(B)     Award compensatory and punitive damages as stated above;

(C)     Grant Injunctive and Declaratory Relief as appropriate; and

(D)     Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a **jury trial** as to all issues triable by a jury.

Respectfully submitted,

*Bruce Simmons*

Bruce Simmons--Pro se
283 S.W. 8th Street, Apt. B
Dania Beach, Fl., 33004-3906

NOTARY PUBLIC IN AND FOR
THE STATE OF FLORIDA

SUBSCRIBED AND SWORN BEFORE
ME, A NOTARY PUBLIC, ON THIS

24 DAY OF *November* 20 25

My Commission Expires On: *November 3, 2026*

_____  Notary Public

# Appendix

Exhibit  A

Filing # 236136797 E-Filed 11/19/2025 11:49:53 AM

| ☒ IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA ☐ IN THE COUNTY COURT IN FOR BROWARD COUNTY, FLORIDA | |
| --- | --- |
| **STATES NOTICE OF RELEASE OF DOMESTIC VIOLENCE BOND CONDITIONS** | CLOCK IN |

| STATE OF FLORIDA V. | CASE NUMBER |
| --- | --- |
| Bruce Simmons | 25010691CF10A |
| DEFENDANT | |

The State of Florida has filed a ☐ nolle prosse memorandum / ☒ no information as to the Domestic Violence charges in this case. The Defendant in this case is no longer on Domestic Violence pretrial release. The prior Order(s) of Pretrial Release Conditions entered pursuant to F.S. 903.047 in this case is/are hereby OF NO FURTHER FORCE OR EFFECT.

Filed in Fort Lauderdale, Broward County, Florida this     19th     day of     November     2025

HAROLD F. PRYOR

State Attorney

By: /s/ Marcie Zaccor

MARCIE ZACCOR, ESQUIRE
Assistant State Attorney
FL Bar    0148581
201 Southeast 6th Street, #225
Unit    DVU
Fort Lauderdale, FL 33301
(954) 831-7978
Email: courtdocs@sao17.state.fl.us

| Defendant | DOB | 12/27/1955 | Sex: | M | Race | BLACK | Height: | 509 | Weight: | 160 |

XSB     0002727750          SCDS58          XCN          028788307     RDV

Exhibit  B

Filing # 236136797 E-Filed 11/19/2025 11:49:53 AM

  

FV                                                DVU

Susan L Alspector                                              FELONY

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,

|  |  |  |  |  |
|---|---|---|---|---|
| | Plaintiff | Court Case Num: | 25010691CF10A | SAO Num: 2727750 |
| V. | | Offense Rpt No: | DN2509001398 | Offense Date: 9/10/2025 |
| | | Charge Agency: | BROWARD SHERIFFS OFFICE | Case Type: AR |
| | | Arrest No: | BS25003060 | Arrest Date: 9/12/2025 |
| **BRUCE SIMMONS** | Defendant | DOB:12/27/1955 Race:B | | Sex: M   BCCN: 0086001 |

---

TO THE CLERK OF THE ABOVE-STYLED COURT:

The State hereby announces the following actions to be taken on the charges involved in the above-captioned arrest/matter:

Action taken:     DECLINE CASE

| Count | Action | Short Description | Charge |
|---|---|---|---|
| 1 | **NO INFO** | **784.041(2)(A) - 3/CF - BATTERY (FELONY) DOM/STRANGULATION** | |
| | Chrg Presented | 784.041-2A(HGD) - 3/CF - DOMESTIC BATTERY BY STRANGULATION-DATING RELATION | 1 |
| 2 | **NO INFO** | **784.03(1)(A)(1) - 1/MM - BATTERY (STRIKE/TOUCH)** | |
| | Chrg Presented | 784.03-1A1(HGD) - 1/M - TOUCH OR STRIKE/BATTERY/DATING VIOL | 2 |

| Victim's Names |
|---|
| ████████ |

Special Instruction to the Clerk/Jail

Dated ___ Day of   November, 2025

| Clerk Comments | | |
|---|---|---|
| Filed _____ | Custody Status_____ | Division ____ |
| Arraignment_____ | | |

Harold F. Pryor, State Attorney
By:  **Martie Zaccor**                    ASA /   ML
Florida Bar No:   0148581
Phone:   (954) 831-7978                 Unit   DVU

CLERK COPY

Exhibit  C

SIMMONS, Bruce **DOB:** 12/27/1955 (68 yo M) **Acc No.** 1142145 **DOS:** 06/10/2024

# Progress Note



SIMMONS, Bruce

68 Y old Male. DOB: 12/27/195

Account Number: 114214

283 SW 8th St Apt B, Dania, FL-3390

Home: 754-802-815

Guarantor: Simmons, Bruce   Insurance: MCR-HUMANA MEDICAR

Appointment Facility: 145-Dania Beac

06/10/2024                                                    Progress Notes:  MARCIA CARVALHO, APRN, RN

**Current Medications**
**Taking**
- Melatonin 5 MG Tablet 1 tablet in the evening Orally Once a day
- Famotidine 20 MG Tablet 1 tablet at bedtime as needed Orally twice a day
- Sacubitril-Valsartan 24-26 MG Tablet 1 tablet Orally one a day
- Meloxicam 15 MG Tablet 1 tablet Orally Once a day
- Folic Acid 1 MG Tablet 1 tablet Orally Once a day
- OxyCONTIN 10 MG Tablet ER 12 Hour Abuse-Deterrent 1 tablet Orally as directed
- oxyCODONE-Acetaminophen 10-325 MG Tablet Oral 1 every 4 - 6 hours as needed
- Carvedilol 6.25 MG Tablet One tablet oral twice a day Oral twice a day
- Simvastatin 10 MG Tablet One tablet oral once a day at bedtime Oral once a day
- Aspirin Adult Low Dose 81 MG Tablet Delayed Release One tablet oral once a day with food Oral once a day
- Clotrimazole-Betamethasone 1-0.05 % Cream Apply twice a day to right foot External twice a day
- Albuterol Sulfate HFA 108 (90 Base) MCG/ACT Aerosol Solution 1 puff as needed Inhalation every 4 hrs
- Triamcinolone Acetonide 0.1 % Ointment 1 application Externally Twice a day
- Tamsulosin HCl 0.4 MG Capsule TAKE ONE CAPSULE BY MOUTH ONE TIME DAILY Oral
- Finasteride 5 MG Tablet Oral
- Pantoprazole Sodium 40 MG Tablet Delayed Release 1 tablet Orally Once a day
**Not-Taking**
- Ciprofloxacin HCl 500 MG Tablet 1 tablet Orally every 12 hrs
- Amitriptyline HCl 25 MG Tablet 1 tablet at bedtime Orally Once a day
- Cyanocobalamin 100 MCG Tablet as directed Orally one a day
- Dicyclomine HCl 20 MG Tablet 1 tablet Orally one a day
- Naproxen 500 MG Tablet 1 tablet with food or milk as needed Orally 2 time daily
- Cyclobenzaprine HCl 10 MG Tablet 1 tablet at bedtime as needed Orally 3 time daily
- Sildenafil Citrate 100 MG Tablet TAKE ONE TABLET BY MOUTH AS NEEDED AS DIRECTED
- Metoclopramide HCl 10 MG Tablet 1 tablet before meals Orally three times a day
- cefTRIAXone Sodium 1 GM Solution Reconstituted NDC 68180-633-01 Injection
- oxyCODONE-Acetaminophen 5-325 MG Tablet 1- 2 tablets as needed Orally every 6 hours for 3 days
- dexAMETHasone Sodium Phosphate 20 MG/5ML Solution 4mg/mlNDC 67457-422-00 Injection
- hydrOXYzine HCl 25 MG Tablet One tablet oral twice a day Oral twice a day

Reason for Appointment
1. Referral to NRS
Assessments
1. Benign neoplasm of sphenoidal sinus - D14.0 (Primary)
2. Inguinal hernia - K40.90
3. Chronic pain syndrome - G89.4
4. Hypertensive heart disease with heart failure - I11.0, HTN Associated with Unspecified combined systolic (congestive) and diastolic (congestive) HF. Pt on Aspirin and Carvedilol Treatment
5. Benign neoplasm of prostate - D29.1
6. Body mass index (BMI) 20.0-20.9, adult - Z68.20
Treatment
**1. Benign neoplasm of sphenoidal sinus**
Notes: As per CT scan head 9/6/2023
Left Sphenoidal sinus
-F/U w NRS- required for prostate biopsy as per Anesthesiologist
Clinical Notes: Symptoms include headaches, persistent nasal congestion, pain in the forehead, cheek, nose or around the eyes or ear, postnasal drip at the back of the throat, doubl or blurred vision, loss of sense of smell or taste.

**2. Inguinal hernia**
Notes: Robotic bilateral inguinal hernia repair with mesh insertion with Dr. Alvaro Garcia on 5/10/2024, was rescheduled for after prostate biopsy
Clinical Notes:
The soft tissue is often part of the intestine. It's easy to see and feel the bulge, although not all are visible by the patient, especially when obese.
Symptoms include pain, especially when a person coughs, bends, or lifts a heavy object.
Treatment may not be necessary. If the hernia is growing or painful, surgery can repair it.

**3. Chronic pain syndrome**
Notes: Patient with hx of chronic pain
Continue current pain management plan as discussed.
Always refill your meds before you run out of them.
Instructed patient on nonpharmacologic pain relief measures, including relaxation techniques positioning ,etc.
Instructed to report to physician if experiencing pain level not acceptable , pain level greater than 6/10, pain medications not effective, unable to tolerate pain medications, and pain



**SIMMONS, Bruce DOB:** 12/27/1955 (68 yo M) **Acc No.** 1142145 **DOS:** 06/10/2024

• albuterol 0.83 % Solution Therapy Pack NDC 0487-9501-032.5 MG /3 ML Inhalation , Notes to Pharmacist: *Reorder from Medispan for eRx and Interaction Alerts*
Medication List reviewed and reconciled with the patient

### Past Medical History

Memorial Regional Hospital (7/10/21): Abdominal Pain,.
Memorial Regional Hospital 07/15/2019/ Mouth Injury,.
Memorial Regional Hospital, 04/08/2016 Muskuloskeletal leg pain,.
Memorial Regional Hospital. 04/09/2017. Generalized Abdominal Pain,.
Memorial Regional Hospital 01/22/2019/ Chest Pain/ SOB,.
Urgent Care MD Now 06/16/2018/ Swollen Right eye,.
cardiac problems Heart attack,.
History of nicotine dependence,.
history of parasitic infestations (History of Hepatitis C as per lab results cured w/o treatment, .
No accident,.
Memorial Regional 04/21/21,.
Brain Tumor,,.
Memorial Reginal Hospital.05/19/2016 to 05/21/2016.
Acute chest pain. ~Cardiac enzymes elevated,..
Memorial Regional Hospital.12/03/2015 to 12/05/2015.
Heart Attack,,.
Surgery/Hospitalizations: 3 finger suregery/Right Hand and 1 left hand/2010,2012 and 2015,, .
Surgery/Hospitalizations: 3 finger surgery/Right Hand and 1 left hand,/2010,2012 and 2015,,.

### Surgical History

history of Other surgeries Both knee surgery, both hands no prior surgery No surgery recent

### Family History

Mother: deceased
Migrated Family History: family history of cancer Pancreatic/ Mother, family history of Essential Hypertension Parents, family history unchanged
Father: alive

### Social History

Tobacco Use:
Tobacco Use/Smoking
Are you a *nonsmoker*
Tobacco use other than smoking
Are you an other tobacco user? *No*
Migrated Social History:
Migrated Social History: smoking status : Former smoker, smoking status : Former smoker Quit 25 years ago,,, No, I didn't started to drink larger amounts neither drink coffee for a longer period, not a social drinker, not using alcohol, not using drugs, No, I do not feel an intense desire to drink coffee, I do not feel bad neither feel any symptoms if I stop drinking coffee, smoking status : Never smoker, daily coffee consumption was two cups per day, good exercise habits.
Drugs/Alcohol:
Drugs
Have you used drugs other than those for medical reasons in the past 12 months? *No*
Alcohol Screen (Audit-C)
Did you have a drink containing alcohol in the past year? *No*
Points 0
Interpretation *Negative*
Caffeine
Intake: *3 Cups a week.*
Do you smoke marijuana?: Denies.
Do you drink alcohol?: No.

### Allergies

Zithromax: Nausea or Vomiting or Diarrhea: Yes; Asthma or Short of Breath: Yes; - Allergy - Onset date 02/11/2016

### Hospitalization/Major Diagnostic Procedure

Memorial Regional Hospital ( Chest Pain.) 03/29/23
Urgent Care. 06/23
Memorial Regional Hospital { abdominal pain } 08/10/23
Memorial Regional Hospital. ER. 09/2023
Memorial Regional Hospital 10/07/23
Leg Swelling 01/17/24 to 01/19/24

affecting ability to perform normal activities.
Will follow-up for further assessment and recommendations.
Clinical Notes: -F/U w Pain Management

### 4. Hypertensive heart disease with heart failure



Notes:
-Followed by Cardio
Chronic, Controlled
Diet low sodium reinforced DASH diet
Advised to lose weight
Advised to do exercises, walk 30 minutes daily
High blood pressure is a silent killer. Advised to monitor BP on regular basis and keep a log and bring to next visit
Counseling to take the medication as indicated
Advised to avoid alcohol and avoid smoke

### 5. Benign neoplasm of prostate

Notes: Followed by Urologist Mark Christ
Biopsy on 6/2024
-continue medications as prescribed
-avoid alcohol and caffeine, drinking fluids at bedtime
-avoid decongestants and antihistamines, saturated and trans fats
-report any lower urinary tracts sumptoms such as such as daytime urinary urgency and nocturia, and/or voiding disturbances, such as urinary hesitancy, weak stream, straining, and prolonged voiding.
- Patient verbalized understanding.

### 6. Body mass index (BMI) 20.0-20.9, adult

Notes: Normal BMI
Continue healthy diet and exercise

Follow Up
2 Months (Reason: Or sooner if clinically necessary)
History of Present Illness

### History of Present Illness:

68 y.o AA male presents today for follow up. Herniectomy was potpone for after prostate biopsy, he is followed by Urologist- Dr Steven Tannebaum-, he wanted to be in patient procedure w anesthesia, Urologist referred to Dr Alvaro Garcia-General surgeon but anesthesiologist did not feel comfortable unless he is reevaluated by NRS due to the hx of brain tumor
Dr Jose Gusman Cardio -clearance for surgery
Urologist- Dr STeven Tannebaum- biopsy 06/10/2024, maybe 06/3/2024 he wanted to be in patient, referred to Dr Alvaro Garcia-General surgeon
Luis Alberto Rodriguez NRS.

Vital Signs
Temp: **98** F, HR: **67** /min, BP: **127/80** mm Hg, Wt: **140** lbs, Ht: **5'9''**, BMI: 20.67 Index, Oxygen sat %: **97** %, Wt-kg: 63.5 kg.

Examination
-Exam:
GENERAL APPEARANCE Looks well nourished, Well developed, No acute distress.
HEAD Atraumatic.
EYES Clear sclera.

Exhibit D

**Radiology Consultants**
**of Hollywood**
Phone (954) 927-1776
210 South Federal Highway, Hollywood, FL 33020



**Pines Radiology**
**Center**
Phone (954) 431-7627
9050 Pines Blvd. Suite 170, Pembroke Pines, FL 33024

| | | | |
|---|---|---|---|
| Patient Name: | SIMMONS, BRUCE | Patient ID: | SIMB9528 |
| Referring Physician: | Hoche, Jubran A | Date of Birth: | 12/27/1955 |
| Date of Study: | 07/06/2022 9:33 AM | Gender: | M |
| Facility | HOLLYWOOD | Age: | 66 |
| Procedure: | MRI BRAIN W/O & W DYE | | |

## MRI OF THE BRAIN WITH AND WITHOUT CONTRAST:

**INDICATION:** Follow-up neoplasm.

**COMPARISON:** 06/18/2020

**TECHNIQUE:** Multiplanar, multisequence MR imaging of the brain was performed before and after the administration of 17 cc of ProHance contrast on a 1.5 Tesla magnet.

**FINDINGS:**

There is no acute infarct or hemorrhage. No evidence of midline shift. There is no hydrocephalus. The ventricles and sulci are age-appropriate. There are minimal microangiopathic chronic ischemic changes. There is a stable 4.8 x 3.7 x 3.4 cm lesion centered in the left sphenoid sinus extending to the left sphenoid bone, sphenoid wing and masticator space. The lesion appears also to extend to the left optic canal encasing the left optic nerve.

**IMPRESSION:**

Stable 4.8 x 3.7 x 3.4 cm lesion centered in the left sphenoid bone extending left sphenoid wing and masticator space as described above.

Electronically Signed by: Pantol, Gustavo MD
BOARD CERTIFIED NEURO (CAQ) RADIOLOGIST
Approved: 07/07/2022 1:13 PM

**Radiology Consultants**
**of Hollywood**

Phone (954) 927-1776
210 South Federal Highway, Hollywood, FL 33020

**Pines Radiology**
**Center**

Phone (954) 431-7627
9050 Pines Blvd, Suite 170, Pembroke Pines, FL 33024

| | | | |
|---|---|---|---|
| Patient Name: | SIMMONS, BRUCE | Patient ID: | SIMB9528 |
| Referring Physician: | Hernandez Medina, Jorge | Date of Birth: | 12/27/1955 |
| Date of Study: | 01/08/2020 10:43 AM | Gender: | M |
| Facility | HOLLYWOOD | Age: | 64 |
| Procedure: | MRI BRAIN W/O DYE | | |

MRI OF THE BRAIN WITHOUT CONTRAST:

INDICATION: Rule out neoplasm.

TECHNIQUE: The MRI was done using 1.5 Tesla high field strength short bore magnet. T1, diffusion weighted and FLAIR sequences are used. Images are obtained in the sagittal, axial and coronal projections. No intravenous contrast was used.

FINDINGS: The main pathology is identified in the sphenoid sinus. There is an expansile lesion in the sphenoid sinus which shows intermediate density on the T1 sequences. T2 sequences of the signal appear to be variable. The periphery of the lesion shows higher signal intensity, and the posterior and mid section shows intermediate to lower signal intensity. So this is not a cyst. It is a solid lesion. It does seem to cause partial break of the anterior portion of the sphenoid sinus wall and inferior portion of the wall. The middle cranial fossa and anterior cranial fossa seem to be intact and there is no loss of bone in this area. The pituitary shows no mass. The suprasellar cistern and optic chiasm are normal. So this lesion may represent mucocele or a carcinoma of the sphenoid sinus. The study should be repeated using intravascular contrast. A portion of the clivus also appears to be eroded by the lesion. The erosions could be caused by mucoceles and also by carcinoma.

The posterior fossa demonstrates the fourth ventricle to be midline. No cerebellar masses, infarcts, or hemorrhage are identified. The pons and brainstem are normal. The cranial nerves demonstrate no obvious pathology. The ventricular system and cortical sulci are normal. No evidence of brain edema or masses of the brain are identified. There are three nodules with demyelination in the deep white matter in both hemispheres suggestive of degenerative gliosis.

IMPRESSION:

1. THERE IS AN EXPANSILE LESION OF THE SPHENOID SINUS WITH LONGEST DIAMETER OF 3.4 CM. THE LESION IS CAUSING EROSION OF THE BONE, INFERIOR WALL AND ANTERIOR WALL. THERE IS SOME BULGING OF THE WALLS ON ALL SIDES AND EROSION OF A PORTION OF THE CLIVUS. THE LESION IS SOLID AND SHOWS VARIABLE SIGNALS. DIFFERENTIAL DIAGNOSIS IS MUCOCELE VS CARCINOMA OF THE SINUS. REPEAT STUDY USING INTRAVASCULAR CONTRAST IS RECOMMENDED.
2. THE REST OF THE BRAIN SHOWS A FEW NODULES OF DEMYELINATION IN DEEP WHITE MATTER IN BOTH HEMISPHERES SUGGESTIVE OF DEGENERATIVE

**Radiology Consultants of Hollywood**
Phone (954) 927-1776
216 South Federal Highway, Hollywood, FL 33020

**Pines Radiology Center**
Phone (954) 431-7627
9050 Pines Blvd. Suite 170, Pembroke Pines, FL 33024

| | | | |
|---|---|---|---|
| Patient Name: | SIMMONS, BRUCE | Patient ID: | SIMB9528 |
| Referring Physician: | Hernandez Medina, Jorge | Date of Birth: | 12/27/1955 |
| Date of Study: | 01/08/2020 10:43 AM | Gender: | M |
| Facility | HOLLYWOOD | Age: | 64 |
| Procedure: | MRI BRAIN W/O DYE | | |

GLIOSIS.

Electronically Signed by
Grnja, Vladimir

06/17/2013  22:37      3055291619            AMBULATORY MED REC                    PAGE   05

**CORAL GABLES MRI, INC.**
**760 PONCE DE LEON BOULEVARD**
**CORAL GABLES, FLORIDA  33134**
TELEPHONE: 305-446-7893

IVAN NEGRON, M.D.
15801 S. W 137 AVE
MIAMI, FL 33177

| Patient: | SIMMONS, BRUCE | Social#: | |
| Address: | FCI 54822004 | DOB: | 12/27/55 |
| | MIAMI, FL 33177 | Age: | 054 |
| | | MRN#: | 00008105701 |

**Exam: 01MRI, BRAIN; W/O CONTRAST MATL, THEN**                  **Date of Service: 12/15/10**

## TECHNIQUE:

STANDARD PULSE SEQUENCES AT 1.5 TESLA, PRE AND POST CONTRAST
ADMINISTRATION.  CORRELATION MADE TO PRIOR STUDY OF 2006.

## FINDINGS:

AGAIN SEEN IS THE HETEROGENEOUS SOFT TISSUE MASS CENTERED IN THE LEFT
SPHENOID SINUS/CLIVUS WHICH SHOWS HETEROGENEOUS, DENSE ENHANCEMENT AFTER
CONTRAST ADMINISTRATION.  TODAY, THE MASS MEASURES 6.3 TRANSVERSE X 3.8
AP X 3.4 CRANIOCAUDAL CM.  OVERALL SIZE IS CONSIDERED STABLE GIVEN
SLIGHT DIFFERENCES IN IMAGE LOCATION BETWEEN THE EXAMINATIONS.  THE MASS
ABUTS BUT DOES NOT INVADE THE SELLA TURCICA.  THERE IS, HOWEVER,
ENCASEMENT OF THE LEFT OPTIC FORAMEN AND, THEREFORE, THE LEFT OPTIC
NERVE.  THE MASS DISPLACES THE INTERNAL CAROTID ARTERIES LATERALLY ON
BOTH THE RIGHT AND LEFT SIDES.  THE OPTIC CHIASM REMAINS MIDLINE AS DOES
THE PITUITARY STALK.  FLOW VOIDS OF THE ADJACENT INTERNAL CAROTID
ARTERIES REMAIN INTACT.  NO OTHER ENHANCING MASSES ARE SEEN.

DIFFUSION IMAGING SHOWS NO EVIDENCE OF ACUTE INFARCTION.  THERE IS NO
INTRAPARENCHYMAL HEMORRHAGE.  THERE IS NO HYDROCEPHALUS, EXTRAAXIAL
FLUID COLLECTION OR MIDLINE SHIFT.  BASAL CISTERNS ARE MAINTAINED.
THERE IS NO SULCAL EDEMA OR EFFACEMENT.

THE REMAINING PARANASAL SINUSES AND MASTOID AIR CELLS ARE NORMALLY
AERATED.

## IMPRESSION:

STABLE SIZE AND APPEARANCE OF THE HETEROGENEOUSLY ENHANCING MASS WHICH
FILLS THE ENTIRE SPHENOID SINUS, INVOLVES A GOOD PORTION OF THE LEFT
SPHENOID BONE, AND ENCASES THE LEFT OPTIC NERVE AND FORAMEN.



ROBERT BEECHAM, M.D.

06/17/2013  22:37    3055291619          AMBULATORY MED REC                    PAGE  04



Electronic signature of:

ARI F ABRIL, M.D.

Transcribed by AMD9LUPE on 08/29/2012 at 01:05 PM
D:  08/29/2012
Job#: 9766

SEP. 17. 2010· 4:23PM    MEDICAL RECORDS

RECEIVED  09/17/2010 15:44

NO. 135    P. 5

**CONSULTATION REPORT**

Request for consultation _____ *Cesar Guerrero.*
                              Physician                    Dept. _____

Please see patient _____ *Bruce Simmon*
                          Name of Patient

Reason for request _____ *Neurosurgical evaluation*

Date _____ 9/9/10 _____          Signed _____ M.D.
                                         Name of Attending Physician

Report of Consultation  54 y.o. B/M states since around 2004 started
ē severe headaches. 1st MRI he was diagnosed of
a tumor at the base of skull, sphenoid sinus ē
apparently P/4 MRI of brain last done
May 23. 2008 showed same size of a
large 3.3 × 3.4. × 3.6 cm. Tumor in the base
of skull, sphenoid sinus near both Carotid's
arteries. Tumor also going into base of
sella turnica, clinoid. —
It remains ē no other complaints except
headaches.
It has normal neurological examination
at this time

Diagnosis: Tumor at base of skull
in the sphenoid sinus
& left pterygoid fossa

Plan: It need to be seen at University of Miami
base skull surgeon. to do biopsy then
consider resection vs. Gamma Knife TC.

Date _____ 9/9/10. _____          Signed _____ M.D.

**L A R K I N**
**H O S P I T A L**

**CONSULTATION REPORT**

021-035

SIMMONS BRUCE
DOB: 12/27/1955    AGE: 54    HSV: RAD
ADMIT: 09/09/10             SEX: M
REF:
ATT: GUERRERO CESAR
MR #: 000228782    #: 0
                   #: /4419
                   PAT #: 7608353

06/26/2005  19:40    305441866      SOUTHEASTHERNHEALTHM                   PAGE  01

CORAL GABLES MRI, INC.
747 PONCE DE LEON BOULEVARD
CORAL GABLES, FL  33134
(305) 447-8897

****************CORRECTED REPORT(D/O/B)******************
05/22/2005

RE:         SIMMONS, BRUCE
PATIENT #:  161107
DOB:        12/27/1955
DATE:       05/13/2005

## MAGNETIC RESONANCE SCAN OF BRAIN WITH AND WITHOUT CONTRAST - 05/13/2005:

STANDARD PULSE SEQUENCES OF THE BRAIN WERE OBTAINED ON A 0.3 TESLA MRI **WITH AND WITHOUT** THE USE OF IV GADOLINIUM.

FINDINGS:  THERE ARE NO EXTRA-AXIAL FLUID COLLECTIONS OR INTRAPARENCHYMAL HEMORRHAGE.  THERE IS NO MASS EFFECT OR MIDLINE SHIFT.  THE VENTRICLES AND SULCI ARE AGE APPROPRIATE.  THE POSTERIOR FOSSA DEMONSTRATES NO TONSILLAR ECTOPIA OR HERNIATION.

THERE IS A SOFT TISSUE MASS THAT IS ARISING FROM THE SPHENOID SINUS WHICH DEMONSTRATES HETEROGENEOUS SIGNAL ON ALL SEQUENCES AND DEMONSTRATES HETEROGENEOUS ENHANCEMENT FOLLOWING GADOLINIUM ADMINISTRATION WHICH MEASURES 3 X 4 CM AND IS EXTENDING TO INVOLVING THE LEFT SPHENOID WING AND LEFT PTERYGOID FOSSA.  THE PITUITARY GLAND IS NORMAL IN APPEARANCE. THE VII AND VIII CRANIAL NERVE COMPLEXES ARE SYMMETRICAL BILATERALLY.  THE FRONTAL AND BILATERAL MAXILLARY SINUSES ARE NORMAL IN APPEARANCE.

## IMPRESSION:

SOFT TISSUE MASS ARISING FROM THE SPHENOID SINUS AS DESCRIBED ABOVE WHICH DOES APPEAR TO BE CAUSING MASS EFFECT UPON THE OPTIC CHIASM.  RECOMMEND CLINICAL CORRELATION.

**CONTINUED**

M. ROSADO, MD.
CLINICAL DIRECTOR
PCI MIAMI

6/22/05

**RADIOLOGIST COPY**



**Memorial**
**Healthcare System**

Hollywood, FL 33021
954-265-5600

**Patient Name: Simmons, Bruce**
**MRN:** 5331063   **CSN:** 5019356887
**DOB:** 12/27/1955   **AGE/SEX:** 59yrs / Male
**Status:** STAT
**Loc:Class:** Outpatient
**Dept:** MRH CT SCAN
MEMORIAL REGIONAL HOSPITAL

**Authorizing Provider:** Marika Fraser, MD
Phone: 954-265-2750
Fax: 954-893-6323
Phys ID # 108858
**Admitting Provider:**
Phone: 954-265-2750
Fax: 954-893-6323
Phys ID #

**Reason for Exam:** spenoid mass r/o carcinoma
**Exam:** CT stryker sinus without iv contrast \ STAT

**ACC#** 30914067
08/13/2015  4:55 PM

INTERPRETATION
CT SCAN OF THE PARANASAL SINUSES

INDICATION: SPHENOID SINUS MASS.

TECHNIQUE: Axial thin-cut imaging, Stryker technique, noncontrast, coronal reformats. Additional direct coronal imaging performed.

COMPARISON: MRI, OUTSIDE, DATED 06/30/2015.

FINDINGS: There is an expansile process involving the sphenoid including the clivus. The process extends into the greater wing of the sphenoid and into the pterygoid processes. Part of the abnormality has ground-glass density in it and the most likely diagnosis is fibrous dysplasia. Overall this is a benign expansile hypertrophic process. The abnormality involves both the greater and lesser sphenoid wings including anterior clinoid process. Abnormality borders the optic canal as well as the superior and inferior orbital fissures. I do not see stenoses of these structures, however. Basilar foramina and vascular grooves are included but they are patent. There is vascular calcification. Limited view of the brain, in obtaining sinus images shows no abnormality. The lateral wall of the left orbit is thickened. I do not see proptosis. The ocular globes, muscle cones and optic nerves are normal.

Normal nasopharynx. Paranasal sinuses are clear.

INTERPRETATION:

EXPANSILE PROCESS INVOLVING THE SPHENOID. IT IS A LONGSTANDING ONE AND SOME FEATURES OF IT SHOW GROUND-GLASS APPEARANCE. I BELIEVE THAT THIS IS A BENIGN PROCESS SUCH AS FIBROUS DYSPLASIA.

End of diagnostic report for accession: 30914067

Thank you,
Neil Kappelman, MD



**Memorial Healthcare System**

Hollywood, FL 33021
954-265-5600

**Patient Name: Simmons, Bruce**
**MRN:** 5331063    **CSN:** 5019356887
**DOB:** 12/27/1955    **AGE/SEX:** 60yrs / Male
**Status:** STAT
**Loc:Class:** Outpatient
**Dept:** MRH CT SCAN
MEMORIAL REGIONAL HOSPITAL

**Authorizing Provider:** Marika Fraser, MD
Phone: 954-265-2750
Fax: 954-893-6323
Phys ID # 108858
**Attending Provider:**
Phone:
Fax:
Phys ID #

End of diagnostic report for accession: 30914067

Thank you,
Neil B Kappelman, MD
Dictated by: EDI, RADIANT IN on Fri Aug 14, 2015  8:25:10 AM EDT
Transcribed by: JEANNINE POWELL on Fri Aug 14, 2015  8:47:41 AM EDT
Preliminary Result By:
Signed By: Neil B Kappelman, MD on 08/14/2015  8:50 AM
Addended By:

# Exhibit E

Simmons, Bruce (MRN 5331063)                                    Encounter Date: 06/15/2017

# Simmons, Bruce

MRN: 5331063

**Luis R McGoldrick, MD**          Progress Notes          Encounter Date: 6/15/2017
Physician                         Signed
Neurosurgery



**Neuroscience Center**
**Memorial Regional Hospital * Memorial Hospital West**

Joe DiMaggio 🌟 Children's Hospital
**Division of Neurosurgery**

## Follow up Visit

**PATIENT**: Bruce Simmons
**MRN**:     AC005331063C
**DOB**:     12/27/1955

## Subjective

Bruce Simmons is a 61 y.o. male who since he was 18 years old has been having chronic headaches. At that time he had one episode of transient blindness of his left eye which recovered spontaneously. Over the years he has been diagnosed with fibrodysplasia of the sphenoid bone. No treatment has been performed for that. He has not had any more episodes of blindness and his current problem is chronic headaches.

## Objective

VITALS:
Vitals:
                    06/15/17 1341
BP:                 123/74
Pulse:              56
Temp:               36.4 °C
Weight:             70.8 kg
Height:             172.7 cm

PHYSICAL EXAM:
Neurologic Exam Oriented to time place and person, good recent and remote memory, good attention span andconcentration. Language is normal, speech is clear. Pupils are equal and reactive, extraocular movements are full, facial sensation is normal. Facial movements are symmetric and

Simmons, Bruce (MRN 5331063)                          Encounter Date: 06/15/2017

normal.  Hearing is good, uvula and palate elevate symmetrically, sternocleidomastoid and trapezius are normal.  Tongue protrudes symmetrically.

Finger to nose examination and rapid alternating movements are normal.  Deep tendon reflexes are normal there is no clonus no Babinski no Hoffman.  Motor examination shows no deficits, sensory examination shows no deficit.

Personal information intentionally blocked out as it is irrelevant to this matter.

Nov 22, 2025
Date

By: Bruce Simmons
Plaintiff

IMAGING:  I reviewed CT scan of the brain from August 2015, an MRI of the brain with and without contrast from June 2015, a CT scan of the brain from June 2016.  There is an expansile appearance of the sphenoid bone with a groundglass appearance of the bone.  There is no compromise of the optic canals.  The lesion has been stable in all of the studies and is compatible with fibrous dysplasia.

## ASSESSMENTANDPLAN

ASSESSMENT /PLAN:
Impression: Fibrous dysplasia of the sphenoid bone.

Simmons, Bruce (MRN 5331063)                                          Encounter Date: 06/15/2017

**Recommendations:** There is no indication for any surgical intervention in this gentleman.  There is no other treatment for fibrous dysplasia.  At this age it is likely that the process will remain stable and not worsened.

He should continue to manage his headaches symptomatically and he has a pain doctor who he sees for that.  There is nothing we can offer from the neurosurgical standpoint.

Luis Alberto Rodriguez, MD
6/15/2017
MPM MRH
DIVISION OF NEUROSURGERY AT MRH
1150 N 35th Avenue
Suite 300
Hollywood FL 33021
Dept: 954-265-1490

**Office Visit**
on
6/15/2017